

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 23, 2020

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Kintea McKenzie*, S9 18 Cr. 834 (PAE)

Dear Judge Engelmayer:

    The defendant is scheduled to be sentenced in this matter on November 17, 2020 at 10:30 a.m. The Government respectfully submits this letter in connection with sentencing. The parties entered into a plea agreement (the "Plea Agreement") that calculated a stipulated Guidelines range of 46 to 57 months' imprisonment based on the defendant's plea to Count Eight for assault with a dangerous weapon in aid of racketeering (the "Stipulated Guidelines Range"). The parties further agreed that neither party would seek a sentence above or below the Stipulated Guidelines Range. The Probation Department calculates the same Guidelines range in the final pre-sentence investigation report, dated September 12, 2019 ("PSR"), and recommends a sentence of 46 months' imprisonment. Consistent with the Plea Agreement, and for the reasons explained below, the Government respectfully submits that a sentence at the top of the Stipulated Guidelines Range of 46 to 57 months' imprisonment is appropriate in this case.

    **I.**    **Offense Conduct**

    The defendant was a member of the Gorilla Stones set of the Bloods gang and was an acquaintance of Daniel Hernandez, a/k/a "Tekashi 6ix 9ine." In or about November 2017, Hernandez released a song entitled "KOODA," that both featured the defendant in the music video and was named after the defendant.

    Throughout early 2018, Hernandez was in a public dispute with a rival rap artist and gang member from Chicago known as "Chief Keef." On or about June 1, 2018, Hernandez learned that Chief Keef was going to be in New York. Hernandez was in Los Angeles at the time, but reached out to the defendant and offered him $20,000 to shoot at Chief Keef. Hernandez was explicit that the defendant not shoot Chief Keef, but that the defendant should only scare Chief Keef. The defendant agreed. The defendant subsequently assembled a group of individuals to carry out the shooting. The group included the shooter, the defendant, a driver, and at least one other individual. The defendant and the shooter could be seen on surveillance video waiting outside the W Hotel in

Times Square.  The shooter eventually shot above the heads of Chief Keef and a member of Chief Keef's entourage.  After the shooting, the shooter and the defendant ran back to the waiting vehicle and drove off.

The next day, Hernandez and Kifano Jordan, a/k/a "Shotti," met with the defendant.  Although Hernandez had offered $20,000 to the defendant, Jordan told Hernandez to only pay the defendant $10,000.

## II.   Procedural History

The defendant was charged in an indictment that was unsealed on January 31, 2019.  The defendant self-surrendered on February 8, 2019.  On June 3, 2019, the defendant pleaded guilty to Count Eight of the S9 18 Cr. 834 Indictment, pursuant to the Plea Agreement.  The defendant, who had been released on bail pending trial, surrendered to the United States Marshals on June 17, 2019. The Plea Agreement calculated a Stipulated Guidelines Range of 46 to 57 months' imprisonment.  The Probation Department calculated the same Guidelines Range in the PSR and recommended a sentence of 46 months' imprisonment.

On March 30, 2020, the Court granted the defendant's motion for bail pending sentencing due to the defendant's asthma condition and the COVID-19 pandemic.  Yet, within hours of being released, the defendant was seen partying with numerous other individuals (some of whom appeared to be smoking marijuana) in his apartment – in complete disregard of all recommendations by health officials to practice social distancing.

On October 15, 2020, the defendant surrendered to the custody of the United States Marshals Service and is currently detained.

## III.   Applicable Law

The Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)–(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## IV.  Discussion

The Government submits that a sentence at the top of the Stipulated Guidelines Range of 46 to 57 months' imprisonment is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.

The defendant coordinated one of the most high-profile shootings committed on behalf of the Nine Trey Gangsta Bloods ("Nine Trey") in 2018 – a shooting outside the W Hotel in Times Square.  To orchestrate the shooting, the defendant assembled a group, including a driver and a shooter, that travelled to and waited outside the W Hotel in Times Square until the targets came outside, and then shot in their direction, endangering not only Chief Keef, but others in the area.  The defendant's crime was not one of instinct or passion.  Instead, it was a well-contemplated and calculated shooting, planned over the course of at least several hours, involving multiple participants, and designed to convey that Chief Keef was not safe from the reach of Nine Trey, even in the heart of Times Square.  While the defendant claims in a letter appended to his sentencing submission that "I immediately regretted what I did but I did not know what to do," (Def. Mem., Ex A. at 1), his words are belied by his actions.  The defendant could have done many things.  He could have turned himself in.  He could have implicated the others involved in this reckless shooting.  He could have used the incident as an opportunity to channel a more positive message through his music.  He did none of these things.  Instead, despite claiming that "*[r]ight away* I realized what I did was wrong and seriously dangerous," (*id.* (emphasis added)), a full day after the shooting, the defendant had no problem collecting his promised payment from Hernandez.

The defendant only has one prior conviction for petit larceny (PSR ¶85); however, given that he has pled guilty to a serious offense, the defendant has not seemed to treat this matter with the appropriate significance that it deserves, which gives the Government pause that the defendant will not be deterred from committing future crimes.  Indeed, while the defendant was incarcerated following his guilty plea, the defendant was caught on more than one occasion using a contraband cellular phone inside the MCC.

One of the most egregious examples of the defendant's post-conviction behavior was his misleading argument to the Court that he needed to be bailed pending sentencing due to grave health concerns stemming from the COVID-19 pandemic and his asthma condition.  Arguing that

he could not maintain social distance while incarcerated, the defendant pleaded to the Court to release him pending sentencing. Yet, within hours of his release, the defendant partied at his apartment with multiple individuals, who appeared to be drinking and smoking marijuana. His actions made clear that he had no sincere fear of contracting COVID-19 and instead used it as a ploy to be released from custody.

The defendant's pattern of deceit continued after the bail episode. In his sentencing submission and letter to the Court, the defendant suggests that he has devoted his time and musical talents to further an anti-violence crusade. Yet, his rap lyrics and music videos – including ones recorded after the instant crime and even after his guilty plea – tell a different story, one that glorifies gang life and violence. Below is a sampling of his music – the lyrics of which are attached as Exhibits to this submission.

**"Blicky's Funeral" – Uploaded on January 25, 2017 (available at https://www.youtube.com/watch?v=AFh3kKRekTM) – Selected lyrics below, and full lyrics attached as Exhibit A**

> I'm with the poppin', I'm with the bending blocks we could do it all day long (Skrrt, skrrt)
> We are not a gang (Woo!), fuck the fame, real killers put in pain (In pain)
> How you think I got my name? K double-O D, dumping A for aim (What else?)
>
> \*\*\*
>
> Dump, reload, if he a scammer, we straight snatching his Cubans (For the White!)
> Y'all not from the Ville y'all not from O. Hill
> Or the 10 where it's real (White!)
> I bet somebody gon' die if I put the loads on the drill (Woo!)
> Shooters, Rugers, mission Ubers, did it all with the looters (Brr)
> This shit is all facts I'm spitting, this ain't no rumors (What else?)
> Kidnap a top opp (What else?), another folk in my trunk (What else? Skrrt)
> Kidnap a top opp (Ahh), boy that's three for the month (Kooda B)

In these selected lyrics, the defendant appears to say that "real killers put in pain" – that is, those who earn the reputation as killers put in work for the gang. In addition, he says that he got his name – Kooda – by "dumping A for aim," and dumping is slang for "dumping rounds" or shooting. He also raps about "shooters, Rugers, mission Ubers" and kidnapping a "top opp." These are clear references to committing acts of violence against gang rivals.

**Walking Through the Ville (A Thousand Miles Remix) – Released on August 13, 2018 (available at https://www.youtube.com/watch?v=-bmKUMiqmJ0&list=LLHaj6a1Xww_9cpxxd8fRXEg&index=425) – Selected lyrics below, and full lyrics attached as Exhibit B**

> Making my way through the Ville, walking slow
> N\*\*\*as know not to run up

    Boom-boom-boom-boom-boom, it coulda been you
    Boom-boom-boom-boom-boom, it coulda been you
    Boom-boom-boom-boom-boom, it coulda been you
    Boom-boom-boom-boom-boom, I won't miss you
    Boom-boom-boom-boom-boom, these hollows hit 'em up

The lyrics here are pretty self-explanatory. The imagery of the video clearly shows it is about shooting rivals who "run up" on the defendant's and his associates' territory.

**6IX9INE – Uploaded on August 26, 2018 (available at https://www.youtube.com/watch?v=aOs_jwHqS1M) – Selected lyrics below, and full lyrics attached as Exhibit C**

    I don't wanna talk it out, spin through the ville you ain't walkin' out
    We do not miss, boy keep runnin' your lips, get killed through my morning route (woah)
    Gang, get killed through my morning route
    We do not miss, boy keep runnin' your lips, get killed through my morning route, yeah, yeah

Here, the imagery from the video shows the defendant and others pointing their hands to the camera as if they are guns and pulling the trigger. Moreover, the above lyrics again promote violence against rivals.

**Quagmire – Uploaded on November 28, 2018 (available at https://www.youtube.com/watch?v=hVdDntwrzb4) – Full lyrics attached as Exhibit D**

This video was released a little over a week after Hernandez and other members of Nine Trey were arrested. Again, the imagery and lyrics are more of the same from the defendant.

**Wop Wop – Released on January 21, 2019 (available at https://www.youtube.com/watch?v=paoxj1wl5C8) – Selected lyrics below, and full lyrics attached as Exhibit E**

    God-given wop wop, ride up in the drop-top
    I got my Glock Glock, quick to make it hot, hot
    We send them shots, shots, somebody getting' pop, popped
    I cannot stop running to the guap, opp

    \*\*\*

    For that bag, we on yo' ass, we will not stop
    Bing, blaow, man down
    Ambulance out when Kooda come around
    Bing, blaow, man down
    Ambulance out when Kooda come around

Again, these lyrics are fairly explicit: the defendant is singing about having a "Glock" at the ready, so he could "make it hot," and send "shots." Moreover, he says that the "ambulance" is out when "Kooda come[s] around." This is yet another song promoting and glorifying gang violence.

**Still Thinking About It – Released on June 27, 2019 (available at https://www.youtube.com/watch?v=Oz-wiMvkQ-E) – Selected lyrics below, and full lyrics attached as Exhibit F**

> Look, I don't wanna talk about it
> So nobody call my phone
> Asking all this damn questions
> How the hell I came home (real nigga shit)
> Stay ten toes, I ain't fold

What is remarkable about this song is that the defendant filmed it while he was on house arrest (as the ankle bracelet is visible approximately 27 seconds into the video), and the defendant is bragging that he was staying "ten toes" – that is, that he did not cooperate and took a plea. In addition, there are several instances in the video in which the defendant appears to point his fingers at the camera and pull the trigger – again, promoting violence.

**Wooo Talk – Released on August 10, 2019 (available at https://www.youtube.com/watch?v=LwvQ-Eos88s) – Selected lyrics below, and full lyrics attached as Exhibit G**

> Know what I'm jackin', when they see us
> They better Woo (They better Woo)
> I call up my shooter, press of a button
> You on the news (you on the)
> You better
> Watch out, Woo (Woo!)
> When we come
> Pop out
> Woo (Woo!)
>
> \*\*\*
>
> Don't compare me to nobody, do what I want
> See I'm in a different lane
> Couple hats with me
> Couple loccs with me
> But this ape shit in my veins (what)
>
> \*\*\*
>
> Anybody that's there with an afro

>Leavin' with a part
>Back after back, hit after hits (Oh shit)
>They know who we are
>Shots fired
>Somebody dead, right there in the park
>Free Loccs, free Drew, after this scream "Free me!" (Gang!)
>Next nigga say my name, gon end up on the T.V.
>Pix 11, Channel 7, News 12, Fox 5
>Shade room, TMZ

Again, the lyrics of this song (released two months *after* the defendant pleaded guilty) clearly promote gang violence – "call up my shooter, press of a button, you on the news." In addition, the defendant professes his loyalty to the Gorilla Stone set of the Bloods gang – "this ape shit in my veins" – as "ape" is a common reference to a member of the Gorilla Stones. It is also clear that this song was written *after* the defendant was charged, because he makes a reference to "Free me." This is a common phrase – "free [insert name]" – that people will post to social media in support of others who are incarcerated.

The defendant is free to sing about whatever he wishes to sing about. What the Government objects to, however, is the defendant's protestations in his sentencing submission and letter to the Court that he was somehow shocked to learn that the music video "KOODA" by Hernandez featured guns, and that the defendant opposes such glorification of gang violence because all of his videos and song lyrics are supposedly to the contrary. This blatant misrepresentation makes it difficult to take him at face value when the defendant claims that he has "learn[ed] very important lessons from [his] conduct in this case" and that he "made a foolish choice [that he] won't make again" (Def. Mem., Ex. A at 3).

The Government believes that a sentence at the top of the Stipulated Guidelines Range is necessary to deter the defendant from committing future crimes and to deter others who may wish to follow in the defendant's footsteps.

## V.     Conclusion

Accordingly, given the serious nature of the offense, the defendant's post-conviction actions, and the need for specific and general deterrence, the Government respectfully submits that a sentence at the top of the Stipulated Guidelines Range is appropriate in this case.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:     s/
Michael D. Longyear
Jonathan E. Rebold
Jacob Warren
Assistant United States Attorneys
(212) 637-2223 / 2512 / 2264

cc:     Richard Rosenberg, Esq. (by ECF)